# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JOSE RIOS-MORENO,

        Plaintiff,

v.                                                      No. CIV 11-971 LH/LFG

MARY JAMES, Health Services Administrator,
and JUNE KERSHNER,[1] Nurse Practitioner,

        Defendants.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[2]

## Introduction

        This is a *pro se, informa pauperis* civil rights action brought under 42 U.S.C. § 1983 by

Plaintiff Jose Rios-Moreno ("Rios-Moreno") against Health Services Administrator Mary James and

Nurse Practitioner June Kershner ("Defendants").[3]  Rios-Moreno civil rights lawsuit arises out of

medical treatment during his incarceration at Cibola County Correctional Center Department

---

[1] Defendants state that the initial caption of this complaint showed June Kershner's name misspelled. [Doc. 25, at 1.]  This caption is corrected.

[2] Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions).

[3] Rios-Moreno initially named Warden Lee Vaughn, and Assistant Warden A.W. Russell as Defendants. [Doc. 1.] The Court dismissed those Defendants and related claims against them. [Doc. 7.]

("CCCC"). On May 8, 2008, Rios-Moreno was transferred to CCCC from Safford FCI in Arizona; his projected release date is March 2, 2013. [Doc. 25, Ex. A.].

Rios-Moreno's Civil Rights Complaint [Doc. 1], filed October 31, 2011, asserts that his Eighth Amendment rights were violated, a possible claim of medical negligence, and several state law claims. Specifically, Rios-Moreno contends that Defendants acted with deliberate indifference in violation of the Eighth Amendment by not providing him with knee surgery or a knee replacement. He seeks a preliminary and permanent injunction against Defendants "for the Plaintiff to receive all needed medical services do [sic] to prisoners, . . .", "a knee surgery," "nominal, compensatory, consequential and punitive damages" for pain and suffering, and post-judgment interest, attorney's and court fees. [Doc. 1, at 8-9.]

### Procedural Background

On August 3, 2012, Defendants filed an Answer, denying all allegations related to medical negligence or violations of the Eighth Amendment. [Doc. 21.] Defendants further argued, *inter alia*, that Rios-Moreno's lawsuit is barred in whole, or in part, by limitations contained in the Prison Litigation Reform Act ("PLRA"), and that Rios-Moreno failed to exhaust his administrative remedies. [Doc. 21, Affirmative Defense Nos. 7, 9.]

On August 7, 2012, the Court entered an Order directing Defendants to submit a <u>Martinez</u> report, addressing Rios-Moreno's allegations and Defendants' affirmative defenses. [Doc. 22.] In its Order, the Court explained that the <u>Martinez</u> report could be used for summary judgment purposes and that Rios-Moreno would have an opportunity to respond to the report and to provide conflicting evidence, should any exist. The Court further advised the parties that the <u>Martinez</u> report could be used in deciding whether to grant summary judgment on Rios-Moreno's claims and that all parties should submit whatever evidence might be relevant.

On October 2, 2012, Defendants submitted their <u>Martinez</u> report.  [Doc. 25.]  On December 26, 2012, Rios-Moreno filed a response.[4]  [Doc. 29.]   Therefore, this matter is ready for resolution. In reaching its recommended disposition, the Court considered all of the pleadings and attachments, including Rios-Moreno's complaint and exhibits, Defendants' <u>Martinez</u> report, along with all the exhibits, and Rios-Moreno's response.

**Analysis**

I.    **Exhaustion of Administrative Remedies**

In accordance with the PLRA, 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e *et seq*., inmates must exhaust prison grievance procedures before filing a lawsuit.  28 U.S.C. § 1915A; 42 U.S.C. § 1997e(a).

> No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.  42 U.S.C. § 1997e(a).

A prisoner who begins the grievance process but does not complete it may be barred from pursuing a § 1983 claim under the PLRA.  <u>Starks v. Lewis</u>, 313 F. App'x 163, 2009 WL 427108. at *2 (10th Cir. Feb. 23, 2009) (unpublished) (*citing* <u>Jernigan v. Stuchell</u>, 304 F.3d 1030, 1032 (10th Cir. 2002)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007) (internal citation omitted).

---

[4]Because Rios-Moreno did not file a response to the <u>Martinez</u> report by the deadline, the Court issued an Order to Show Cause directing Rios-Moreno to explain why he had not filed a response and why summary judgment should not be granted in favor of Defendants. [Doc. 26.] Rios-Moreno then filed objections to the Order to Show Cause stating that he never received a copy of the <u>Martinez</u> report. [Doc. 27.] The Court directed the Clerk to mail Rios-Moreno a copy of the report and gave him a new deadline by which to respond. [Doc. 28.] On December 26, 2012, Rios-Moreno filed the present response. [Doc. 29.]

Here, Rios-Moreno claims he completed all procedural requirements for exhaustion under the PLRA in accordance with the prison's grievance procedure. [Doc. 1, at § 6 (p.4 of Complaint); § 10 (p.5 of Complaint).] He further asserts that his "new requests" were either denied or not answered. [Id. at § 11 (p.5 of Complaint).] Rios-Moreno filed a number of exhibits in support of his position that he exhausted administrative remedies. [Doc. 1, Exhibits.]

In its Order directing submission of a Martinez report, the Court asked Defendants for any support showing that Rios-Moreno did not exhaust his administrative remedies or satisfy exhaustion requirements under the PLRA.  In response, Defendants assert that Rios-Moreno failed to timely file his grievance as the basis of his claim concerned an event that occurred in January 2010, or in July 2010.  Defendants contend that Rios-Moreno did not file an "Informal Resolution" until March 21, 2011, or an "Inmate/Resident Grievance" until April 4, 2011.  Thus, according to Defendants, his claim was filed eight to fourteen months too late. [Doc. 25, at 23.] In addition, Defendants briefly state that the documents attached to Rios-Moreno's complaint, when read in conjunction with the facility's grievance policy, indicate he did not timely file his grievance paperwork. [Id.]

In his response, Rios-Moreno argues he properly exhausted all administrative remedies and that he timely complied with grievance requirements. [Doc. 29, at 3-4.]

Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of raising this defense and establishing that the inmate failed to exhaust all of his administrative remedies.  *See* Tuckel v. Grover, 660 F.3d 1249, 1254 (10th Cir. 2011) (*citing* Jones, 549 U.S. at 212).  Here, the Court finds disputed issues of material fact concerning the issue of exhaustion, and, therefore, proceeds to the merits of Rios-Moreno's claims.

II.   **Summary Judgment Standard**

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting an entitlement to summary judgment must support its assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). A court may grant summary judgment in favor of the movant if the material facts are undisputed and show that the movant is entitled to judgment. Fed. R. Civ. P. 56(e)(2) and (3).

The moving party bears the burden of showing that no genuine issue of material fact exists. Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002); Muñoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000). The court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *See, e.g.*, Wade v. Emcasco Ins. Co., 483 F.3d 657, 660 (10th Cir. 2007). However, the opposing party may not rest upon mere allegations, denials, averments, or contentions in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is genuine if the evidence is "significantly probative" or "more than merely colorable" such that a jury could reasonably return a verdict for the non-moving party. Id. at 249-50. Mere assertions, conjecture, or the existence of a scintilla of evidence in support of the non-movant's position, are not sufficient to show a genuine issue of material fact; an issue of material fact is genuine only if the non-movant presents facts such that a reasonable jury could find in favor of the non-movant. Carpenter v. Boeing Co., 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and quotations omitted).

5

"The purpose of a summary judgment motion is to assess whether a trial is necessary." Berry v. T–Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007).  "In other words, there 'must be evidence on which the jury could reasonably find for the plaintiff.'"  Id.

### A. *Factual Background*

### *2006*

Rios-Moreno attached a "chronology" of his treatment that contains typed entries from 2006 to January 2010. [Doc. 1, p. 30.] It is unknown who prepared this chronology.  On January 26, 2006, the chronology states x-rays of Rios-Moreno's knees showed degenerative changes "left greater than right."

### *2008*

On May 6, 2008, Rios-Moreno was transferred to CCCC. [Doc. 25, Ex. A.] On the inmate transfer form from the Arizona facility, dated May 2, 2008, "DJD [degenerative joint disease] L Knee" is noted as a health problem of Rios-Moreno's. [Id., Ex. B-1.] The transfer form does not contain any additional notations as to Rios-Moreno's knee problem, diagnoses, or treatment during his incarceration in Arizona.   The standard intake screening form indicated he was taking Indomethacin and Tylenol for "DJD." [Id., Ex. C-1.]

On May 10, 2008, Rios-Moreno submitted an "Inmate Request to Staff Form" ("request form"), which is used to make a written request to a CCCC staff member.  Rios-Moreno stated he needed medication for pain, but did not specify the location of the pain.  A medical staff member responded in writing to Rios-Moreno that his medication would be brought in the mornings and evenings. [Id., Ex. B-2.]

On May 14, 2008, Rios-Moreno submitted another request form, stating –

> I am trying to get care on my problem I was thinking that I was going to get out of here soon and start to walk out these but this is taken to long and my problem is getting worse day after day the pain is getting bigger and bigger and I have no medicine. . . .

On May 16, 2008, a nurse wrote that Indomethacin[5] 25 mg capsules were ordered for Rios-Moreno. "Try picking them up during your next scheduled 'Blister pack day.'  This medicine is to help control pain issues." [Id., Ex. B-3.]

On May 25, 2008, Rios-Moreno submitted a request form, stating he needed Acetaminophen[6] with the Indomethacin to relieve pain as that was the way he had taken it before.  He claimed that the Indomethacin was not strong enough to kill the pain.  June Kershner, CFNP, responded on May 27, 2008, stating she ordered "Tylenol 325 mg 2-3 tabs 3x day" as needed for additional pain relief. She further noted that they would assess Rios-Moreno at his intake physical exam in June.  He was to pick up his blister pack at the "medline" Monday through Wednesday or Friday at 1 p.m. [Id., Ex. B-4.]

There is an inmate health appraisal dated June 19, 2008, noting tender right midfoot with swelling at the site.  An x-ray was ordered.  Rios-Moreno had problems with his knees from crepitus.[7]  The form also indicates he had an accident in 1987 when in injured his left knee and had degenerative arthritis with pain, rated 6 of 10 during the last six months. [Id., Ex. C-2.] A follow-up

---

[5]"Indomethacin [also known as Indocin] is used to relieve pain, swelling, and joint stiffness caused by arthritis, gout, bursitis, and tendinitis. Reducing these symptoms helps you do more of your normal daily activities. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID)." www.webmd.com (10/10/2012).

[6]"Acetaminophen (such as Tylenol) reduces fever and relieves pain. It does not reduce swelling, as do nonsteroidal anti-inflammatory drugs (NSAIDs), such as aspirin and ibuprofen, but it also is less likely to cause stomach upset and other side effects."  www.webmd.com (10/10/2012).

[7]Crepitus is a "medical term to describe the grating, crackling or popping sounds and sensations experienced under the skin and joints or a crackling sensation due to the presence of air in the subcutaneous tissue."  http://en.wikipedia.org/wiki/Crepitus (12/27/12).

form from this date states Rios-Moreno initially complained of chronic pain in both knees and that he was having more pain over the last six months, but that his knees had been hurting for three years.  He had an accident in 1987 when he "messed up his left knee when he fell from a truck" and received no medical care.  His present illnesses were noted as: degenerative joint disease in the left knee with probable ACL rupture and right knee, probably with DJD.  He was seen by an orthopedic surgeon in March 2007 in Safford, Arizona, at which time there was documentation of injections in his left knee.  At that time, Rios-Moreno was prescribed Naprosyn.[8]  Most testing at that time was negative.  His injections lasted four months and were repeated July 31, 2007.  His current medications were Indocin[9] and Tylenol.  He admitted to minimal exercise and further stated the Indocin reduced his pain from a rating of 10 of 10 to 6 of 10.  Kershner advised Rios-Moreno to submit cop-outs[10] if the symptoms worsened and she would request an orthopedic referral. [Id., Ex. C-3.] Rios-Moreno was advised about self-care measures and exercises.  He was to use a bike to exercise his legs and neoprene knee supports that were issued.  He was given a low bunk at the low tier.  He was also advised to lose more weight, as much as 10-20 pounds.

As of June 19, 2008, Rios-Moreno was assigned to regular work duties with restrictions.  He also was assigned to a lower bunk and not required to do any food service work.  [Id., Ex. E-2.]

Rios-Moreno's chronology of medical treatment [Doc. 1, p. 30] documents that he had a general "medicine work up" on June 19, 2008, where his chief complaints were pain in both knees, greater in the left knee.  He reported that he was seen by an orthopedic surgeon in Safford, AZ in

---

[8]"Naprosyn (naproxen) is a nonsteroidal anti-inflammatory drugs (NSAIDs). It works by reducing hormones that cause inflammation and pain in the body."  http://www.drugs.com/naprosyn.html (12/27/12).

[9]Similar to or same as Indomethacin.

[10]A "cop-out" is an Inmate Request to Staff Members. [Doc. 25, at 5 n.3.]

March 2007.  He received injections of Naprosyn to his knees that lasted four months.  The assessment was degenerative joint disease in his left knee with potential ACL rupture.  The right knee also probably had degenerative joint disease.

On July 14, 2008, Rios-Moreno submitted a request form addressed to "Dr. June," stating he would like her to check his left knee because on Thursday morning at the gym, he slipped and "got his knee out of place again."  A nurse responded by asking Rios-Moreno to come to sick call to be seen by medical staff during office hours, on Monday through Friday, 5:30 a.m. to 6:45 a.m.  She informed Rios-Moreno that staff could make referrals if necessary.  In the meantime, she instructed Rios-Moreno to use his two pain medications as recommended. [Id., Ex. B-5.]

On September 22, 2008, Kershner's progress note for Rios-Moreno indicates he was prescribed Acetaminophen and Naproxen. [Id., Ex. D-1.]  He complained of pain in the right forefoot not being relieved with Indocin.  He walked about three laps a day.  He was wearing tennis shoes with good support.  An x-ray of his right foot was negative for a fracture.  He did not want a special diet.  [Id..]

### *2009*

Rios-Moreno was seen at the cardiac chronic care clinic on January 27, 2009.  He complained of pain in his right foot when walking.  He was prescribed Lisinopril for hypertension. [Id., Ex. D-2.] He was to discontinue Naproxyn.  He was restricted to no prolonged standing or walking as of January 27, 2009.  [Id., Ex. E-3.]

On April 29, 2009, Rios-Moreno was seen at the chronic care clinic.  He had low back pain and chronic arthritis in the left knee.  His hip range-of-motion was full.  He was given advice on exercising.  [Id., Ex. C-4.]  On May 20, 2009, Rios-Moreno submitted a request form to "medical staff," stating that he had not received an answer concerning his request for services.  He needed to

know if the medical staff was going to take care of his problem that required more medication than prescribed.  He further stated that the medications Dr. Pitts gave him did not help.  [Id., Ex. B-6.] The response is stamped with Dr. David B. Pitts' name on June 3, 2009, and states that Rios-Moreno has known "OA [osteoarthritis] of knees/feet.  The combo of Ibuprofen/Tylenol is very good for most pain." [Id.]

On July 24, 2009, Dr. Pitts saw Rios-Moreno at the chronic care clinic for complaints of coughing and constipation.  Chronic osteoarthritis was noted as to his left knee.  Some medications were changed on this date. [Id., Ex. C-5.]

On August 12, 2009, Rios-Moreno submitted a request form addressed to Dr. Pitts, asking if he was going to change his pain pills.  Rios-Moreno stated he had been informed that Tylenol was going to be cut off, even though he continued to suffer from pain.  He wanted something done about his knee.  The response, dated August 14, 2009, from an LPN, stated that Rios-Moreno had an order for both Tylenol and Ibuprofen 600 mg. for pain and that both prescriptions were good until October 31, 2009. [Id., Ex. B-7.]

On August 21, 2009, Rios-Moreno's medications were listed as Colace, Tylenol, Hydrochlorothiazide, fiber tablets, and 81 mg. aspirin.   [Id., Ex. D-5.]

On September 6, 2009, Rios-Moreno submitted a request form addressed to Warden Vaughn, stating he had been trying to get medical care for his knee since he arrived.  Rios-Moreno complained that he did not have an answer from the hospital manager as to what they might do about his knee; thus, he wanted to know if the Warden could assist him.  There is a notation on this request form that Rios-Moreno's most recent visit with Dr. Pitts was August 21, 2009, and that his next scheduled visit was November 12, 2009.  In the response, dated September 8, 2009, the nurse wrote that Rios-Moreno had an extensive medical history that included "left knee ACL tear," and "right

knee DJD." The nurse further wrote that Rios-Moreno received regular chronic care visits and currently was taking medications for pain. [Id., Ex. B-8.]

On September 21, 2009, Rios-Moreno submitted a request form addressed "to whom it may concern." He stated he had been in "real pain of his knees" for 4 to 5 days and had to quit taking Ibuprofen because of stomach problems. He complained of barely being able to walk and a lot of pain in both knees. He wondered if someone was going to do something for him. The nurse wrote a response that same day, noting that Rios-Moreno had an order for Tylenol to use every 8 hours for pain, in addition to Ibuprofen. She suggested that Rios-Moreno try to eat something before taking medications if they upset his stomach. She further noted that Rios-Moreno's next appointment was in November, but that he was always welcome to put in a sick call request to be seen by nursing staff. [Id., Ex. B-9.]

A clinic note, dated 9/29/09, states that Rios-Moreno did not want to take the fiber tablets or Colace. He stated the medications did not help. He also did not want to take Ibuprofen which tore up his stomach. He wanted something else for pain. [Id., Ex. D-6.] As of September 29, 2009, Dr. Pitts ordered Rios-Moreno to cease taking Colace, fiber and Ibuprofen. [Id., Ex. D-7.]

On October 13, 2009, Rios-Moreno addressed a request form to Ms. Judd, Assistant Warden. Again, he stated he had tried to get care for his left knee since his arrival to CCCC but that he only received pain medication. [Id., Ex. B-10.] His problem was worsening and his other knee was getting bad as well. Both knees hurt him and he feared having to use a wheelchair. On October 15, 2009, a nurse responded that he had a documented diagnosis of arthritis in both knees and that he had been seen in "chronic clinics" since his admission. He was given several pain medications that caused stomach problems, which is why he was also prescribed Tylenol. His next chronic clinic

11

appointment was November 17th. She informed him to watch the "call outs"[11] and suggested he might want to discuss the possibility of knee supports with the doctor at the appointment. [Id., Ex. B-10.]

On November 17, 2009, Kershner and Dr. Pitts signed off on notes from a chronic care clinic visit. Rios-Moreno discussed the accident that caused his knee pain and the increase of pain in his knee. The doctor noted that his left knee was chronically swollen. He was unable to squat or "duck walk." Rios-Moreno's Tylenol prescription was increased. He was to be seen in "ortho" in three months. They ordered updated x-rays on his knees. [Id., Ex. C-6.] These notes are summarized in Rios-Moreno's chronology. [Doc. 1, p. 30.]

On November 17, 2009, Kershner filled out a request for an orthopedic consultation on behalf of Rios-Moreno, noting he had increased pain of the left knee, muscle atrophy in his left calf and thigh. He was unable to squat or duck walk. X-rays were positive for degenerative arthritis. [Id., Ex. C-7.]

### *2010*

In January 2010, in response to this request for an orthopedic evaluation, Dr. Bryan Kampos[11] saw Rios-Moreno. The doctor noted a diagnosis of advanced osteoarthritis of Rios-Moreno's left knee. "No longer responding to non-surgical measures. Would benefit from total knee arthroplasty. I can do this procedure but would question the appropriateness of doing this elective procedure on a long term prison inmate."  [Id., Ex. C-7; Doc. 1, p. 30.]

---

[11]Although the phrase "call-out" was used on this form, it appears to be the same thing as a "cop-out," *i.e.,* a written request to a staff member by an inmate. [Id., Ex. F-1, at p. 31.]

[11]It is not clear whether the physician's name is Dr. Kamps or Dr. Kampos. [*See* Doc. 25, Ex. C-7, C-8.]

According to the chronology submitted by Rios-Moreno, on January 14, 2010, he was referred to Rehoboth McKinley Orthopaedic Dept in Gallup for chronic pain in left knee, and muscle atrophy in thigh and calf. [Doc. 1, p. 30.]

On February 3, 2010, Dr. Pitts saw Rios-Moreno during a chronic care clinic visit. Rios-Moreno continued with left knee pain. Dr. Pitts noted that Rios-Moreno had seen an orthopedic specialist in 2007 and again on January 7, 2010. He had tried various prescriptions and injections. He really wanted a total knee replacement but Dr. Kampos considered such surgery to be "elective." [Id., Ex. C-8.] Dr. Pitts' examination indicated Rios-Moreno had problems in both knees. He advised Rios-Moreno to continue exercising and strengthening his knee. Dr. Pitts added a prescription of Naprosyn to the Tylenol. He prescribed Omeprazole for ulcer prevention. Rios-Moreno was to be seen by an orthopedic specialist again in six months. [Id., Ex. C-8.]

On March 1, 2010, Rios-Moreno submitted a request form to Dr. Pitts, stating he wanted to know what was decided about his knee because his pain had worsened. Not even the Naproxen provided relief. On March 7, 2010, Dr. Pitts wrote: "After reviewing consultation from orthopedics, he calls the operation 'elective' not required at this time. Would make sure you wore knee support and doing physical therapy along with pain meds." [Id., Ex. B-11.]

On July 30, 2010, Dr. Pitts examined Rios-Moreno at the chronic care clinic. At this time, Rios-Moreno was doing all right and the medications were helpful for his knees. There was minimal crepitus in either knee.

On November 26, 2010, Rios-Moreno was cleared to perform regular work, without restrictions. [Id., Ex. E-4.]

On December 12, 2010, Rios-Moreno submitted a request form addressed to Assistant Warden Russell, stating he had been in an accident and had to have several surgeries, apparently

previous to his incarceration.  When he was taken to an outside hospital at some point, a doctor told

him he needed surgeries on his left knee.  Rios-Moreno complained that his knee pain was becoming

unbearable, radiating up and down his leg.  He asked for an appointment to see an orthopedic

surgeon so that they could schedule him to have a surgery to avoid such excruciating pain.  Rios-

Moreno claimed his daily activities were "placed on hold" because of the pain.  On December 27,

2010, a medical staff member (name indecipherable) wrote that according to a review of Rios-

Moreno's medical chart, he was last seen on July 30, 2010 "per your scheduled ortho chronic clinic.

According to the doctor, there is no need to pursue any other intervention at this time.  According

to the doctor's recommendation, you are to continue your medication." [Id., Ex. B-12.]

### *2011*

On January 28, 2011, Dr. Pitts examined Rios-Moreno during a chronic care clinic visit.

Rios-Moreno was not taking Naprosyn at this time.  He complained of constant left knee pain and

some right knee pain.  Nothing helped.  Rios-Moreno received no relief from NSAIDS/Tylenol.  Dr.

Pitts noted crepitus/pain/swelling in the left knee more than the right.  He was trying a new pain

medication, Ultram.[12]  Dr. Pitts ordered x-rays of the left knee and planned to see Rios-Moreno in

a month.  [Id., Ex. C-10.]

On February 4, 2011, Rios-Moreno had an x-ray of the left knee that revealed no fractures

or dislocations.  There was "moderate narrowing of the knee joint space" with "severe narrowing

in the medial compartment."  There was osteophytic spurring medically as well.  The impression

was "moderate osteoarthritis."   [Id., Ex. C-11.]

---

[12]Ultram is used to treat moderate to severe pain.  http://www.drugs.com/ultram.html (12/27/12).

On February 2, 2011, Rios-Moreno addressed a request form to Assistant Warden Russell, stating he had submitted an "Informal Resolution" on "02/12/10" and had not received an answer. He spoke to his counselor who said that "medical" had the paperwork but they had not yet returned the paperwork.  Rios-Moreno stated he then put a "cop out" to Mrs. James almost a week ago and did not receive an answer.  Thus, he was submitting the request form to Russell to see if she could help him.  On February 7, 2011, the responding staff member wrote that he or she would speak to Ms. James and find out about Rios-Moreno's informal resolution and cop-out.  The staff member stated he or she would have Ms. James get back to Rios-Moreno. [Id., Ex. B-13.]

On February 11, 2011, Rios-Moreno submitted a request form to Dr. Pitts, stating that the first time he took the newly prescribed pain pill, he felt a "rush in his upper body and . . . a lot of pressure on his head and neck . . . ."  He wanted Dr. Pitts to decide what to do.  On February 16, 2011, Dr. Pitts suggested cutting the medication in half. [Id., Ex. B-14.]

On February 23, 2011, Rios-Moreno addressed a request form to Dr. Pitts, stating he could not continue with the medications due to side effects and stomach problems.  In addition, he suffered from itching and a small headache when he took the new medication.  He stated he was not going to take the prescriptions.  Dr. Pitts's written response on February 27, 2011, stated that he would seek a second "ortho opinion" on how to handle Rios-Moreno's knee problems. [Id., Ex. B-15; *see also* Ex. C-12.]

On March 3, 2011, Rios-Moreno addressed his request form to Dr. Pitts, stating he had been waiting for the last "cop out" he told Dr. Pitts that the one-half pill had not helped him and did not stop the pain.  Rios-Moreno still had side effects even when taking half the medication and requested a different pain prescription. On March 12, 2011, Dr. Pitts wrote that he was going to try new pain relievers for Rios-Moreno but that they required "special approval."  "Both will need to

be picked up at the window.  Hope they might help with the pain." [Id., Ex. B-16.] There are notations of new prescriptions in Dr. Pitts' order sheet for March 12, 2011, including Amitriptyline. [13] [Id., Ex. C-12.] The notes also indicate Rios-Moreno was not happy with Ultram and that Dr. Pitts wanted to try Gabepenton[14] and Amitriptyline as a different approach to pain modulation.  [Id., Ex. C-13.]

On March 9, 2011, Rios-Moreno addressed a request form "to whom it may concern."  He stated that since he did not receive an answer from his previous request, he was trying again to obtain another kind of pain reliever.  He asked for any kind of pain reliever that did not contain Tylenol or an anti-inflammatory agent since those medications affected his stomach and kidney. On March 14, 2011, a nurse responded that the "pt seen" and that he was trying new medications prescribed by Dr. Pitts. [Id., Ex. B-17.]

On March 21, 2011, Rios-Moreno submitted a form entitled "Informal Resolution," including an attachment.  Rios-Moreno filed this complaint against the Warden and "HSA James and any other medical staff for "medical negligence, cruel and unusual punishment and inhumane treatment." [Ex., Ex. B-18, p. 5 of 23; Doc. 1, p. 27.] Rios-Moreno alleged that he was seen on July 30, 2010 by the doctor for his six-month chronic visit, at which point, he hold the doctor of his unbearable pain in the left knee.  According to Rios-Moreno, the physician told him he was not an orthopedic surgeon and could not help him, but advised Rios-Moreno to continue with the pain medications.  Rios-Moreno complained in the form that the facility refused him the right of medical

---

[13]Amitriptyline is a tricyclic antidepressant. It affects chemicals in the brain that may become unbalanced.  It may be used for other purposes.  http://www.drugs.com/amitriptyline.html (12/27/12).

[14]"Gabapentin (Neurontin) is a pharmaceutical drug, specifically a GABA analogue[citation needed]. It was originally developed for the treatment of epilepsy, and currently is also used to relieve neuropathic pain."  http://en.wikipedia.org/wiki/Gabapentin (12/27/12).

treatment and an appointment with an orthopedic surgeon.  Rios-Moreno further noted the facility's earlier response that there was no need for any other intervention as to his knee.  Rios-Moreno also alleged that he needed surgery on his knee and that prior use of a knee brace had not helped him or his pain.  Because he had to place more weight on his right knee, he suffered pain in that knee as well.  Rios-Moreno stated that the responses violated the facility's procedures and regulations and the Constitution, because he had not been given proper medical treatment from an orthopedic surgeon.  Rios-Moreno complained that "[t]he CCA staff continues to treat foreign-national worst [sic] than animals."

On March 24, 2011, Rios-Moreno submitted a request form to "medical members," requesting pain killers because he was always in pain.  The prescribed Amitriptyline did not reduce his pain but did make him sleep all day, so he did not want to take that medication.  He requested medications without side effects.  On March 30, 2011, a nurse responded that Rios-Moreno had an appointment on the next day Dr. Pitts would be at that facility. "Very soon!" [Id., Ex. B-19.]

On March 30, 2011, the facility responded to Rios-Moreno's informal resolution, stating that Ms. James had spoken to Ms. Kershner who noted that it was determined surgery was elective.  However, the newest information suggested the use of knee braces and physical therapy.  "Latest information states knee replacement surgery most effective on more elderly."  Medical staff also stated that Rios-Moreno had an appointment with Dr. Pitts on April 2nd at which time his ortho needs would be reviewed.  Rios-Moreno refused to sign this response. [Id., Ex. B-18, p.4 of 23; Doc. 1, p. 25.]

On April 2, 2011, Dr. Pitts examined Rios-Moreno.  His current prescriptions were Ranitidine (for ulcers)/Tylenol/Hydrochlorothiazide.  Rios-Moreno complained of constant pain in both knees.  He had tried knee braces before and they had not helped then.  His left knee pain was

17

worse than the right.  There were osteoarthritis changes to both knees.  X-rays showed severe narrowing of medical compartments as to the left knee.  Dr. Pitts wrote that Rios-Moreno ultimately needed knee replacement for pain relief.  He discussed knee braces with Rios-Moreno who said that was done before, without success.  He wanted to try Tylenol #3 for pain relief.  Rios-Moreno was going to try a certain type of brace and was scheduled for an orthopedic referral in three months.  [Id., Ex. C-14.] It appears that a medical consultant was attempting to obtain the prescribed knee brace for Rios-Moreno, but that as of April 22, 2011, it had to be ordered.  [Id., Ex. C-15.]

On April 4, 2011, Rios-Moreno submitted an "Inmate/Resident Grievance" against the Warden and James.  Rios-Moreno summarized his earlier complaints and requests, along with the request to see an orthopedic surgeon.  He claimed his due process rights were violated when the staff failed to respond to his informal resolution in a timely manner. [Id., Ex. B-20; Doc. 1, p. 20.]

On April 18, 2011, James responded to the grievance, stating that the orthopedic surgeon already indicated that a knee surgery was "optional."  "I have discussed and explained this process to you twice now in both of your informal resolutions.  There are other options that are now recommended to help you which we are putting into place.  Please come to my office if you have more questions.  Unfortunately we do not allow optional surgery unless life threatening." [Id., Ex. B-20, p. 9 of 23; Doc. 1, p. 22.] Rios-Moreno saw this response but refused to sign the form.

Rios-Moreno appealed, arguing that an orthopedic surgeon saw him on January 7, 2010 and recommended surgery.  "He didn't say nothing about optional, Mrs. James."  He contended that James falsified information and continued to refuse to recommend surgery for Rios-Moreno.  Rios-Moreno argued that James continued to mis-diagnose his medical condition while his pain became unbearable.  Rios-Moreno requested a transfer to a "BOP medical facility where [he could] get the

18

surgery and the proper medical treatment." He claimed this was clearly medical negligence and that

he was being treated worse than an animal. [Id., Ex. B-20; Doc. 1, p. 23.]

On April 20, 2011, there is a medical consultation noted by Kershner. She wrote that she

had seen Rios-Moreno on this date and discussed with him how to take the prescribed Gabapentin

i.e., the capsule had to be opened and put in water. Rios-Moreno told Kershner he had complete

relief of knee pain when he was allowed to take the capsule whole. However, he became bloated

and constipated. He wanted to stop the Gabapentin. He stated Tylenol #3 was reducing daytime

knee pain but he still had it at night. He requested a renewal of his Colace. He felt strongly that

knee bracing would not help at all.  [Id., Ex. C-16.]

On April 29, 2011, the Warden responded as follows:

> I have discussed our treatment and care with medical. You were sent
> out to be fitted for a brace to see if it will help with knee problem.
> The specialist you saw indicated that surgery at time is elective and
> so medical staff are going to try the braces first. Medical staff will
> continue to treat your knee problem. Surgery was not recommended
> by the specialist. Medical staff will continue to evaluate other
> treatment options.

[Id., Ex. B-20, p. 9 of 23; Doc. 1, p. 22.]

In the midst of the grievance process, Rios-Moreno submitted a request form to James on

April 19, 2011, requesting that she direct medical staff to provide a medication in capsule form

rather than in powder because the powder tasted "like devil" and upset his stomach. The capsule

form had worked "ok" on Rios-Moreno, but he could not stand the powder form. On April 20, 2011,

Kershner responded by writing that the patient was seen that day and advised of company policy.

[Id., Ex. B-21.]

On April 28, 2011, Rios-Moreno again wrote James, complaining that medical staff did not

want to give him the "Gabapuntin in one piece" and did not replace it with another pain pill. Rios-

19

Moreno complained of more pain and arthritis.  On May 2, 2011, a nurse requested that Rios-Moreno fill out an attached BOP form and return it to medical as soon as possible for prompt treatment. [Id., Ex. B-22.]

On May 5, 2011, there is a clinical note asking why Rios-Moreno stopped taking medication for pain.  Rios-Moreno responded that the pills did not help the pain and he was concerned about side effects.  He did not like the way Amitriptyline made him feel.  He stated that Tylenol #3 did not do anything and wondered why he should "risk his liver."  The LPN asked if the two medications could be stopped.  Dr. Pitts responded that it was all right to stop the medications.  [Id., Ex. C-17.]

On May 7, 2011, Dr. Pitts ordered that Rios-Moreno stop taking Tylenol #3 and Amitriptyline.  [Id., Ex. D-15.]

On May 12, 2011, Rios-Moreno signed an appeal, although it is unclear if it was related to a particular formal or informal grievance.  In the appeal, Rios-Moreno stated he had attached a grievance filed against Warden Vaughn, HSA James and unknown staff for medical negligence, cruel and unusual punishment and inhumane treatment.  Rios-Moreno claims that the Warden responded that the specialist, who was not an orthopedic surgeon, stated surgery for Rios-Moreno was elective.  Rios-Moreno argues to the contrary, asserting that the orthopedic surgeon told him that surgery on his knee "was the only option to correct the torn ligament."  Rios-Moreno further stated that he has worn the braces before and they did not stop the pain.  "The pain is now intense and traveling up to my leg."  He wished to see an orthopedic surgeon who was qualified to diagnose his medical condition. [Id., Ex. B-23; Doc. 1, p. 19.]

The next exhibit provided by Respondents is a "Rejection Notice - Administrative Review," stating that Rios-Moreno's "regional appeal," received on May 23, 2011, was rejected and returned

to him because the "issue is not appealable to the BOP.  You must use the grievance procedures at your facility.  You may appeal this rejection to Central Office." [Id., Ex. B-24; Doc. 1, p. 17.]

On May 26, 2011, Rios-Moreno submitted a request form addressed to Mr. Otero.  The request is written in Spanish.  The request essentially re-states complaints about his knees and pain, along with the medications he was prescribed.  He claimed none of the prescriptions helped the pain, or that if they did, he suffered from side effects. [Doc. 1, p. 33.] On May 29, 2011, a nurse responded that Rios-Moreno was seen on June 23, 2011 and that Dr. Campos applied for non-formulary medication to help with his reported pain.  The medication was to arrive shortly. [Id.]

On May 31, 2011, Hangar Prosthetics was fitting Rios-Moreno with a left knee brace.  [Id., Ex. C-18.]

On June 13, 2011, Rios-Moreno filled in the box for "reason for appeal," noting that he had filed an attached grievance against Warden Vaughn and HSA James for medical negligence, etc. [Id., Ex. B-25; Doc. 1, p. 18.] There is nothing attached.  On August 10, 2011, Rios-Moreno wrote the Central Office, stating he sent his "BP-11" on June 13, 2011, and had not received a response for over thirty days.  He inquired into the status of the grievance. [Id., Ex. B-26.]

There are health services notes made by Dr. Martha Campos on June 23, 2011.  Rios-Moreno was very disappointed because the pain in his knees was very intense and interfering with his ability to walk.  He had severe osteoarthritis.  The notes are difficult to read.  He complained of the unsatisfactory pain management and side effects of pain medications.  His left support brace needed adjustment.  It seemed that a new medication was prescribed.  [Id., Ex. C-20.]

On July 7, 2011, Dr. Campos saw Rios-Moreno at the chronic care clinic.  His left knee was chronically swollen.  His pain had improved with the prescription of Meloxicam/Molic.[15]  The doctor observed his gait/ambulation to be normal.  He was to continue with the Molic.  He was referred to see an orthopedic specialist in three months.  [Id., Ex. C-21.]

On August 10, 2011, Rios Moreno wrote a note to the Central Office of General Counsel stating he "sent my BP-11 on June 13 of 2011 and it has been over thirty days and I am now without any response or any extension of time notice.  Please let me know the status, so I can persue [sic] the next level. . . ." [Doc. 1, p. 32.]

On September 9, 2011, the Central Office responded to Rios-Moreno with a form in which it indicated his appeal "(640836-R1)" was rejected on May 25, 2011, and returned to him because his concern was not appealable to the BOP. [Id., Ex. B-27; Doc. 1, p. 31.]

On October 5, 2011, Kershner signed off on the chronic care clinic visit.  He had been prescribed Meloxicam and Hydrochlorothiazite.  He had not taken the latter for three months.  He stated that the Meloxicam was greatly reducing his knee pain and he was able to walk four laps.  His knees alternated in swelling.  His only side affect was increased gas.    [Id., Ex. C-22.]

### *2012*

On January 2, 2012, Kershner saw Rios-Moreno at the chronic care clinic.  He was taking Meloxicam and Prilosec.  The Prilosec reduced his acid.  He wanted to know if he could still get a knee replacement.  Rios-Moreno told Kershner he would be hearing from his lawyer about his need for knee surgery.  Kershner observed Rios-Moreno to be walking with a normal gait and stride.  He

---

[15]"Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) with analgesic and fever reducer effects. It is a derivative of oxicam, closely related to piroxicam, and falls in the enolic acid group of NSAIDs." http://en.wikipedia.org/wiki/Meloxicam (12/27/12).

suffered from increased crepitus in both knees and chronic swelling.  Kershner wrote on the record that knee replacement surgery was an elective procedure.  Meloxicam was reducing his pain.  "Can wait for his release for replacement."  A referral for an orthopedic consult is noted for six months. [Id., Ex. C-23.]

On April 1, 2012, Rios-Moreno submitted a request form to "Dr. June."  He stated he declined his medical diet "since they will not let me go to the regular diet, when medical diet is not good at all so I want you to take my name off the medical diet, please."  Rios-Moreno also wrote that he had been having a lot of pain in his right knee the last few days and that the right knee pain was worse than his injured left knee.  He stated it was difficult to walk because of pain.  CFNP Kershner wrote that this complaint would be discussed at Rios-Moreno's chronic clinic in June. [Id., Ex. B-28.]

On April 5, 2012, Rios-Moreno submitted another request form addressed to Mrs. James. He noted that he had mentioned right knee pain on the "same comp out" he submitted on April 1, 2012.  He wanted to see an orthopedic specialist because that was the only avenue of help.  He did not believe his pain could be addressed in the usual manners at the chronic clinic and stated the medication was not strong enough for his pain.  Kershner again responded that Rios-Moreno's concerns would be addressed at the chronic clinic.  She also stated she would prescribe extra-strength Tylenol that he could "take with Mobic or in between Mobic dosing for extra relief." [Id., Ex. B-29.]

On April 19, 2012, Rios-Moreno filed another request form addressed to James.  He stated he did not know if "Ms. Quintana" had spoken to James about Rios-Moreno's problems working due to his knees and that his pain was worsening.  He could not sleep and did not know what "you guys are waiting for . . . ."  He felt he would have to use a wheelchair if the problems were not

resolved.  Nurse James responded on April 23, 2012, noting she had spoken with Ms. Quintana and had told her Rios-Moreno had knee problems.  She also spoke to Kershner that morning and Kershner was going to speak with the Regional Director about his problems.  James stated she would call Rios-Moreno to her office after Kershner spoke to the Regional Director concerning what his recommendations for Rios-Moreno would be. [Id., Ex. B-30.]

On April 23, 2012, Kershner made extensive notes about an exam of Rios-Moreno.  It looks like Kershner contacted a Dr. Heggman about Rios-Moreno's request for knee replacement surgery. Rios-Moreno was last evaluated in the chronic clinic in January 2012 and told the provider that Meloxicam was decreasing his knee pain.  He was noted to walk with a normal gait and stride. His knee and calf measurements had not changed a great deal.  The assessment was advanced osteoarthritis of the left knee, with the left knee being more severe than the right.  No significant change was noted on exam.  The procedure sought by Rios-Moreno was elective as stated by the specialist in January 2010.  There is no second opinion indicated per Dr. Heggman.  [Id., Ex. C-24.]

On April 23, 2012, Rios-Moreno's work duties were again restricted.  He was allowed a lower bunk bed.  He was restricted from working food serve duties.  [Id., Ex. E-5    .]

On May 1, 2012, Rios-Moreno submitted a request form to Assistant Warden Russell, stating he had tried to get relief for his knee pain, had submitted several "cop outs to" Kershner and James, asking for stronger medications.  Instead of giving him stronger pain medications, they increased the Tylenol which was hard on his stomach.  On May 2, 2012, James responded, stating that it was explained to him that Kershner was out of the facility.  James had already spoken to Kershner regarding Rios-Moreno's concerns.  "Your surgery has been termed as an elective surgery by the orthopedic physician who evaluated you."  She asked that Rios-Moreno wait for Kershner's response and that she would be calling him to speak about the problems soon. [Id., Ex. B-31.]

On May 14, 2012, Rios-Moreno filled out another request form, submitted to James, asking if he could get a lower bunk bed because it was too difficult for him to climb up and down the stairs with his knee pain.  He also requested a new pair of insoles as the older ones were worn out.  He asked for orthopedic tennis shoes as well.  On May 15, 2012, Kershner responded that Rios-Moreno had a pass for a bottom bunk and the lower tier was that was valid until April 23, 2013.  However, he would have to buy tennis shoes from the commissary. [Id., Ex. B-32.]

On June 27, 2012, Kershner examined Rios-Moreno at the chronic care clinic.  He continued to take Meloxicam, Prilosec and Tylenol.  He stated he did better with this knee pain using Meloxicam.  He reduced his rating of pain to a 4-5 out of 10.  His right knee, however, hurt more than the left knee.   [Id., Ex. C-25.] Medical notes indicate Rios-Moreno was not using his knee brace as of June 27, 2012.  The LPN encouraged him to use it even though it might not be the most comfortable brace.  Rios-Moreno stated he might try to wear it but had not worn it since he got it.  "Doesn't like it."   [Id., Ex. C-26.]

On August 3, 2012, Rios-Moreno submitted a request form to Kershner, asking for another "blister card of Prilosec" because he needed it for his stomach when he took "Meloxicam."  He felt the medication was damaging his stomach and threatened to discontinue it if they did not answer his request soon.  A nurse responded the next day asking him to complete a BOP sick call form and return it to medical. [Id., B-33.]

### B.   *Eighth Amendment Claim*

#### 1.   Legal Standard

"A prison official violates an inmate's clearly established Eighth Amendment rights if he acts with deliberate indifference to an inmate's serious medical needs—if he knows of and disregards an excessive risk to inmate health or safety."  Garrett v. Stratman, 254 F.3d 946, 949 (10th Cir. 2001)

25

(internal quotations omitted).  Stated differently, prison officials violate the Eighth Amendment's ban on cruel and unusual punishment if their deliberate indifference to serious medical needs of a prisoner constitutes unnecessary and wanton infliction of pain.  Self v. Crum, 439 F.3d 1227, 1230 (10th Cir.), *cert. denied,* 549 U.S. 856 (2006) (citations omitted).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must show that he suffered harm sufficiently serious to implicate the cruel and unusual punishment clause.  Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006).  In evaluating an Eighth Amendment claim, the Court conducts a two-pronged inquiry, composed of an objective and subjective component.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  Under the objective inquiry, the "alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension."  Self, 439 F.3d at 1230 (*citing* Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  Under the subjective inquiry, "the prison official must have a 'sufficiently culpable state of mind.'"  Id. at 1231 (*citing* Farmer, 511 U.S. at 834).

In Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981), the Tenth Circuit further explained:

> The two-pronged Estelle standard "requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious."  A medical need is serious if it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment.

(internal citations omitted).

However, the Tenth Circuit makes clear that the "accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment." Id., 639 F.2d at 575 (citing Estelle, 429 U.S. 105-06 ). "A fortiori, a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Id. (internal citations omitted).

Moreover, it is important to note that an inmate's belief that he should have received different or better treatment is not, by itself, evidence of an Eighth Amendment violation or of deliberate indifference to serious medical needs. See Green v. Branson, 108 F.3d 1296, 1304 (10th Cir. 1997) ("We are persuaded that a showing of deliberate refusal to provide medical attention, **as opposed to a particular course of treatment**, coupled with falsification of medical records may give rise to an Eighth Amendment violation and is cognizable under 42 U.S.C. § 1983.") (emphasis added)); Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir.1997) ("[A] prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment.") The fact that an inmate may prefer or believe that another course of treatment is better or warranted is not evidence of a constitutional violation. Perkins v. Kansas Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999) ("[a] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation.") (internal citation omitted).

## 2.   **Analysis**

In this case, Rios-Moreno claims that Defendants' failure to provide him with a knee replacement violates his Eighth Amendment rights. [Doc. 1.] He argues that Defendants' conduct amounts to cruel and unusual punishment because they did not "provide [a] permanent solution" by

agreeing to knee replacement surgery. [Doc. 1, at 6.] By Defendants' failure to allow knee replacement surgery, Rios-Moreno contends that he is unable to participate in daily exercise and to be free from pain and suffering. [Doc. 1, at 7.]

In his response, Rios-Moreno clarifies that he does not claim he was denied medical attention, pain medication, or doctors' visits. [Doc. 29, at 4.] He urges that Defendants should not be entitled to escape civil liability by electing to refuse "needed surgery" to a "federal prisoner who has been incarcerated longer than eight years . . . ." [Id., at 4-5.]

As acknowledged in Rios-Moreno's response, it is clear that Rios-Moreno received adequate, if not extensive, medical care at CCCC. Defendants observe that since his arrival to CCCC in May 2008, Rios-Moreno was prescribed at least eight different pain medications. (*See also* chronology *supra.*) Notwithstanding Defendants' consistent attempts to treat Rios-Moreno's complaints of pain, Rios-Moreno sometimes ceased taking pain medications or did not comply with medical directives. Rios-Moreno submitted at least 25 request forms for medical care about his knees since he arrived at CCCC and was seen by medical care providers on numerous occasions. [Doc. 25, at 22.]

CCCC ordered x-rays in addition to providing medical care and attention. X-rays were negative for fractures. However, they were positive for degenerative arthritis. Defendants advised Rios-Moreno of self-care measures and appropriate exercises for his knees. Medical personnel recommended that he lose weight and placed him on a special diet that he refused. They issued various assistive devices, including knee supports and knee braces, and Rios-Moreno declined to use them. He was assigned to a lower bunk bead and weight restrictions were issued. In 2009, Rios-Moreno was restricted to no prolonged standing or walking. He received regular chronic care visits while at CCCC.

Defendants requested an orthopedic consultation for Rios-Moreno.  In January 2010, the orthopedic specialist noted a diagnosis of advanced osteoarthritis of Rios-Moreno's left knee.  The physician noted that while Rios-Moreno would benefit from a total knee arthroplasty, he "would question the appropriateness of doing this elective procedure on a long term prison inmate."  The knee replacement surgery was determined to be elective rather than necessary or required.  His knee condition was not life-threatening.

In 2011, x-rays of Rios-Moreno's knees indicated moderate osteoarthritis, moderate narrowing of the knee joint space, and severe narrowing in the medial compartment.  However, there were no fractures or dislocations.  Defendants and medical staff repeatedly informed Rios-Moreno that knee replacement surgery was an optional or elective procedure that was not required.  Rios-Moreno disagrees.

In giving Rios-Moreno the benefit of the doubt, the Court will consider Rios-Moreno's knee pain and osteoarthritis sufficiently serious to meet the objective prong of the Estelle v. Gamble test. However, based on the extensive medical care and treatment provided to Rios-Moreno, there is no evidence to demonstrate that Defendants were deliberately indifferent to Rios-Moreno's health. Rios-Moreno provided no evidence to show that Defendants, at any time, consciously disregarded a substantial risk of serious harm.  For example, Defendants did not fail to treat Rios-Moreno's serious medical condition properly nor did they prevent him from receiving medical treatment. They did not refuse pain medication to Rios-Moreno.  Moreover, Defendants did not deny access to specialists who were capable of evaluating Rios-Moreno's knee condition.  The orthopedic specialist determined that Rios-Moreno's choice of treatment was not warranted; instead, knee replacement surgery was determined to be an elective procedure under the circumstances.

This case boils down to a situation where Rios-Moreno disagrees with medical care providers' and specialists' opinions as to how to treat his knee problems.  As stated above, Rios-Moreno's belief that he should have received a knee replacement, or different and better treatment for knee, is not, by itself, evidence of an Eighth Amendment violation or of deliberate indifference to serious medical needs.  Defendants' refusal to provide a particular course of treatment sought by the plaintiff does not constitute deliberate indifference.  *See* Perkins, 165 F.3d at 811.  An orthopedic specialist and other medical care providers are free to exercise their independent professional judgment.  Put differently, an inmate is not entitled to any particular course of treatment even if he thinks it is the preferable treatment.  To proceed with his claim, Rios-Moreno would have to present evidence demonstrating Defendants acted with an "extraordinary degree of neglect," which he did not and cannot do.

Rios-Moreno fails to set forth evidence sufficient to raise genuine issues of material fact with respect to whether Defendants acted with deliberate indifference in treating Rios-Moreno's knee condition.  *See, e.g.,* Albritton v. Quarterman, 2009 WL 585659, at *7 (E.D. Tex. Mar. 6, 2009) (unpublished) (noting that "medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs").  Thus, the Court recommends that the Eighth Amendment claims be denied and dismissed, with prejudice.

**C.**     *__Other Claims__*:

In the Complaint, Plaintiff also attempts to set out claims of negligence, "respondeat superior," negligent supervision, and state tort claims. [Doc. 1, at 6-8.] Defendants argue that the court lacks jurisdiction over any of these state law claims. [Doc. 25, at 23.] By making no further arguments in support of possible state law claims, Plaintiff's response appears to abandon all claims but the § 1983 claim, or the alleged Eighth Amendment violation. [Doc. 29.]

Even if not abandoned, Rios-Moreno failed to provide evidence to satisfy the requirements of any state law claims.  Moreover, the Court finds no support for such claims that could raise genuine issues of material fact.  Therefore, the Court recommends that all state law claims be denied and dismissed, with prejudice.

### Recommendation

The Court recommends that summary judgment on the federal and state law claims be granted with respect to Defendants.  Accordingly, the Court recommends that Rios-Moreno's Complaint be denied and dismissed, with prejudice, as discussed above.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

31